IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

- - -

THE UNITED STATES OF AMERICA, : 2: 22-cr-00139
:
: February 1, 2024
versus :
: (Pages 1 - 37)
:
FREDRICK WENDELL MCCRAY, :
:
Defendant. :
:

- - -

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE BRUCE HOWE HENDRICKS,
UNITED STATES DISTRICT COURT JUDGE

- - -

**A P P E A R A N C E S:**

For the Government:        CHRISTOPHER SCOTT LIETZOW
                          U.S. Attorneys Office
                          151 Meeting Street, Suite 200
                          Charleston, SC 29401-2238

For the Defendant:        CHRISTOPHER JOHN GRAMICCIONI
                          Kingston Coventry, LLC
                          825 Lowcountry Blvd., Suite 106
                          Mount Pleasant, SC 29464

Court Reporter:           LISA D. SMITH, RPR, CRR
                          Official Court Reporter
                          P.O. Box 835
                          Charleston, SC 29401


    Proceedings recorded by mechanical stenography,
transcript produced by computer.

1    *(The following proceedings commenced at 1:30 p.m.)*

2    THE COURT:  Thank you.  Take your seats, please.

3    PROBATION OFFICER:  Your Honor, may I approach?

4    THE COURT:  Uh-huh.

5    *(Pause.)*

6    THE COURT:  Yes, sir, Mr. U.S. Attorney.

7    MR. LIETZOW:  Thank you, your Honor.

8    This is United States of America vs. Frederick

9    McCray.  It's Case No. 2:  22-cr-139-1.  Mr. McCray is

10   represented by Mr. Christopher Grammiccioni.  And we are

11   before your Honor for purposes of a sentencing hearing.

12   THE COURT:  Okay.  Thank you.

13   All right.  Let's go ahead and swear in Mr. McCray.

14   DEPUTY CLERK:  Yes, ma'am.

15   If you'll please stand, sir.

16   *(Defendant sworn.)*

17   THE COURT:  Okay.  Good afternoon, Mr. Grammiccioni.

18   MR. GRAMMICCIONI:  Good afternoon, your Honor.  Nice

19   to see you again.

20   THE COURT:  Nice to see you too.

21   Have you gone over the presentence report with Mr.

22   McCray?

23   MR. GRAMMICCIONI:  Yes, ma'am.

24   THE COURT:  And are y'all ready to proceed?

25   MR. GRAMMICCIONI:  Yes, ma'am.

1    THE COURT:  Mr. McCray, you've read your presentence

2    report?

3    THE DEFENDANT:  Yes, ma'am.

4    THE COURT:  Gone over it with your lawyer?

5    THE DEFENDANT:  Yes, ma'am.

6    THE COURT:  And do you understand it?

7    THE DEFENDANT:  Yes, ma'am.

8    THE COURT:  All right then.  And are there

9    objections, Mr. Grammiccioni?

10   MR. GRAMMICCIONI:  Your Honor, the only objection we

11   lodged was not so much a factual one; it's really based on the

12   aggravating role adjustment that was assigned by probation.  I

13   think it was a plus four.  And Mr. McCray and myself submit

14   that, under the legal standards set forth in the United States

15   Sentencing Guidelines, and also the facts set forth in the

16   PSR, it's more indicative of a plus two.

17   THE COURT:  Okay.

18   MR. GRAMMICCIONI:  I'd be happy to argue that point

19   at this point, your Honor, if you'd like.

20   THE COURT:  Yeah.  Why don't you go ahead and do

21   that.  Mr. McCray can sit down if he'd like.

22   MR. LIETZOW:  May I interject real quick to save some

23   time?

24   THE COURT:  You can interject any time you want.

25   MR. LIETZOW:  Okay.  Thank you, your Honor.

1          I think for purposes of just being more efficient,

2     the government is going to concede that point, that, rather

3     than having a four-point enhancement for a leadership role,

4     the government is going to concede that a two-point

5     enhancement for a manager role is appropriate in this case.

6     The reason we are doing that, your Honor, is primarily because

7     if Mr. McCray were assessed a four-point enhancement, his

8     total offense level would be a 39; if he were to be assessed a

9     two-point enhancement, that would reduce his total offense

10    level to 37.  That would not change the guidelines at all,

11    whether it was a 37 or a 39.

12          THE COURT:  So, y'all agree then?

13          MR. LIETZOW:  Yes, ma'am, we agree that a two-point

14    enhancement is appropriate for this hearing.  And it doesn't

15    change the guidelines.

16          THE COURT:  So, in terms of the record, do you then

17    withdraw your objection or?

18          MR. GRAMMICCIONI:  Yes, your Honor.  I didn't want to

19    speak for the government.  It was my understanding that they

20    were going to concur with that.  So, yes, ma'am, I do.

21          THE COURT:  Okay.  All right then.  And so, then I

22    would ask Madam U.S. Probation Officer -- how many officers do

23    we have down there?  We have two -- to --

24          Ms. Platt, I believe you're the one on this case,

25    correct?

1    PROBATION OFFICER:  That is correct.

2    THE COURT:  -- to put the statutory provisions and

3    guideline provisions on the record, in light of the consent

4    between the parties on that objection.

5    MR. LIETZOW:  Your Honor, there was one other point I

6    think that United States Probation would like us to make prior

7    to putting that information on the record.

8    THE COURT:  Sure.  Okay.

9    MR. LIETZOW:  I believe it was January 10th, if

10   memory is serving correctly, that I submitted a letter to

11   your Honor's chambers in regard to Mr. McCray's status as an

12   armed career criminal.  We submitted a letter that summarized

13   the Department of Justice's position, which is that Mr. McCray

14   should not be classified as an armed career criminal.  The

15   Department of Justice's position is that, because the three

16   prior qualifying convictions were not specifically alleged in

17   the indictment, nor did Mr. McCray make an affirmative

18   admission on the record at his plea hearing, that he would not

19   qualify as an armed career criminal.

20       I would like to point out, though, that there is case

21   law that contradicts the Department of Justice's position;

22   however, nonetheless, that is the Department of Justice's

23   position, and we would ask your Honor to not find that Mr.

24   McCray qualifies under the Armed Career Criminal Act.  That

25   would have qualified Mr. McCray for a mandatory minimum

sentence of 20 years, which would have been the 15 years on
the 922(g) under the armed career criminal, plus the five
years consecutive for the 924(c). If Mr. McCray is not ruled
as an armed career criminal, his mandatory minimum becomes 15
years, which would be the 10-year mandatory minimum for the
drug offense, plus the five consecutive years for the 924(c).

THE COURT: Okay. Yes, sir.

MR. GRAMMICCIONI: That's correct, your Honor. And
as it pertains to the guidelines, again, we did withdraw the
objections that were lodged by earlier counsel, recognizing
that, while there were certain disputes, we recognize that the
government would have met its burden. So, I don't believe the
guidelines are an issue for the Court today.

I will observe the following. While it appears
career offender applies under the finalized PSR, I am going to
be arguing, as part of my 3553 *Booker* variance argument, that
the Court disregard the career offender designation then.

THE COURT: Okay. All right. That makes all -- I
hear you.

And now I'd ask probation to put the statutory
guideline provisions on the record.

I accept the government's request not to sentence him
as an armed career offender.

PROBATION OFFICER: The statutory provisions are as
follows: Custody for Count 1 is 10 years to life. Count 2 is

1    five years to 40 years.  Count 3 is five years, consecutive to

2    all other counts.  Count 4 is 10 years.  Counts 16, 17, 18,

3    20, 21, 22, 23, 24, and 26 is zero to four years.  Supervised

4    release for Count 1 is five years to life; Count 2, four years

5    to life; Count 3, zero years to five years; Count 4, zero

6    years to three years; Counts 16, 17, 18, 20, 21, 22, 23, 24

7    and 26 is zero to one year.  Probation is ineligible.  Fine as

8    to Count 1 is $10 million; Count 2 is $5 million; Count 3 is

9    $250,000; Count 4 is $250,000; Counts 16, 17, 18, 20, 21, 22,

10    23, 24 and 26 is $250,000.  Special assessment is $100 for

11    Counts 1, 2, 3, 4, 16, 17, 18, 20, 21, 22, 23, 24, and 26.

12         The guideline provisions are as follows:  Total

13    offense level is 37.  Criminal history category is six.

14    Probation is ineligible.  360 months to life imprisonment as

15    to Counts 1, 2, 4, 16, 17, 18, 20, 21, 22, 23, 24, and 26;

16    five years as to Count 3, consecutive to all other counts'

17    imprisonment.  Supervised release is five years for Counts 1;

18    four to five years for Count 2; two to five years for Count 3;

19    one to three years for Count 4; and one year for Counts 16,

20    17, 18, 20, 21, 22, 23, 24, and 26.  The fine has not been

21    calculated.  No restitution in this case.  And $1,300 special

22    assessment fee for Counts 1, 2, 3, 4, 16, 17, 18, 20, 21, 22,

23    23, 24, and 26.

24         THE COURT:  Thank you, ma'am.

25         All right.  I'm happy to hear from the government in

1    regards to the 3553(a) factors.

2          MR. LIETZOW:  Thank you, your Honor.  And may it

3    please the Court.  Just on the front end, the government is

4    seeking a guideline sentence in this case.  And going through

5    the nature and the circumstances of the offense, your Honor,

6    Mr. McCray is the leader of a violent criminal street gang

7    that's associated with a national level gang, known as The

8    Rolling 20s Crips.  Locally, that gang is referred to as "YSP"

9    or "Young Solid and Paid."  In addition to the violence, this

10   criminal organization functions as a drug-trafficking

11   organization.  And the government's position is that Mr.

12   McCray is the leader of that organization and is the main

13   source of supply for crack cocaine within that organization.

14         I'll refer your Honor to paragraph 37 of the PSR,

15   which indicates that McCray's organization is primarily

16   responsible for gang-related violence and drug-territory

17   murders.  They have flooded the streets of Charleston with

18   drugs and they sent deadly weapons into various neighborhoods.

19   Your Honor, Mr. McCray's organization essentially overran the

20   Ten Mile community in North Charleston with crime and utilized

21   the community center as one of its primary drug distribution

22   locations.  Mr. McCray was responsible for brokering deals,

23   distributing drugs, directing other members of the

24   organization to distribute drugs, and Mr. McCray was also

25   responsible with providing them with dangerous automatic

weapons that was done for the purposes of protecting the gang, protecting the gang's turf, and protecting the gang's inventory.

Your Honor, as far as the drugs are concerned, Mr. McCray primarily received powder cocaine from his co-defendant, Tyrone Cox, which your Honor has already sentenced earlier to a 25-year prison sentence. Mr. McCray would then take the powdered cocaine that he received from Mr. Cox and he would cook it into crack cocaine. And then Mr. McCray was the main source of supply for distributing that crack cocaine to other -- other drug dealers. And Mr. McCray also had his own clientele base that he dealt with.

Mr. McCray had members of his gang -- such as Terrell Myers, Cornelius Walker, Kevin Dukes, Kenneth Brown, Kendrick Smalls, Earl Allen, and other indicted and non-indicted coconspirators -- would receive crack cocaine from Mr. McCray and then distribute it to various members within the community. And part of this was done for the purposes of insulating Mr. McCray from criminal liability. By having underlings and younger members of the organization distribute his drugs, he would insulate himself, to a certain degree, from detection from law enforcement. Mr. McCray maintained a trap house with the gang, which was located as 5851 Long Leaf in the Ten Mile community. McCray and other members would use this location to meet and sell drugs. And additionally, Mr.

McCray also had an apartment, where he would manufacture his crack cocaine. Federal law enforcement installed pole cams in this area, and the pole cams revealed that Mr. McCray would go to the 5851 Long Leaf location, almost on a daily basis, where he would sell to his clientele, he would supply young members of the gang, and he would then also meet with his suppliers.

What distinguishes Mr. McCray from Mr. Cox and other members of the criminal organization is the level of violence that was involved in this case. The YSP gang was rivals with a gang known as "West Cash," which primarily operated out of the West Ashley area. And law enforcement would be able to attribute at least a dozen murders that were associated with YSP, where either they were the aggressor or one of their members was murdered as a victim as part of this gang violence that was occurring between these two rival gangs. Additionally, there were also dozens of shootings that were a result of these two gangs and other violence that did not result in homicides, but, nonetheless, did involve firearms.

To just draw down specifically on the violence, your Honor, I'd like to turn your attention to a wire call, which is Session 9914. In this call, Mr. McCray and one of his indicted coconspirators, Terrell Myers, are having a conversation about some of the younger members that act as enforcers in their drug organization. And Mr. McCray says, quote: "I tell them boys straight up, hey, my N-word, them

little boys not scared of y'all or nothing now. Them little

boys ready to fire y'all up."

Myers then says: "Yeah, you better tell them Ns,

you're going to shoot in the face now. If you ain't want no

F-ing problem, you better get your money and keep it moving."

Then on wire call, Session 2579, Mr. McCray says:

"If you cross our path, we ready for war any time it presents

itself. But we ain't coming to look for it. We ain't

chasing, but when it comes, we're going to dominate that

mother-F-er. So, if y'all come cross that line, I'm going to

lay your ass facedown, ass up. Everybody got to go

through one eye opener. My one eye opener is when I shoot in

the mall. I don't give an F where I see you, in front of the

courthouse, I'm going to fire your ass up. That's my

definition of on sight." Specifically, Mr. McCray is

referring to a shooting that he was involved with at the

Northwoods Mall on July 3rd of 2017, where Mr. McCray was

involved in shooting at an individual inside of the mall.

That prosecution did not go anywhere as a result of the victim

and the witnesses refusing to cooperate with law enforcement.

So, with the violence, I know your Honor is familiar

that this case involved these devices that are known as

"switches." Switches are items that can be manufactured with

3D printers and oftentimes come from China and other

locations, which are installed on the back of glock

semiautomatic handguns. And those switches then convert that
semiautomatic handgun into a fully automatic handgun, which is
capable of shooting multiple rounds simultaneously with a
single trigger pull. Mr. McCray is responsible for acquiring
10 switches for members of his gang. And there were multiple
members of this gang that were arrested in possession of those
switches. Particularly, Cornelius Walker was arrested with a
glock that had a switch on it, and one ounce of marijuana.
Kendrick Smalls was arrested on a Charleston Police Department
attempted murder warrant. And when he was arrested, his glock
had a switch on it. And Santerio Smith, another unindicted
individual in this organization, was arrested by North
Charleston Police Department, following a vehicle pursuit that
resulted in multiple vehicle collisions, where he had a glock
that had a switch on it inside of his vehicle.

Mr. McCray mentioned these switches on two jail calls
-- I'm sorry, two wire calls in particular. Session 5574, Mr.
McCray is speaking with an unindicted member of his
organization, and Mr. McCray says, quote: "Man, we find the
switches. Dog want $350. Dog got 10 of them. Boy, I said
tell them we want all. I got to get one of them. Dog got 10.
I'm getting me one of them switches. I don't even got a
glock."

Then the very next day on Session 5713, Mr. McCray is
speaking with Williams and says, quote: "I just get me a full

nickel with a switch yesterday. Dog sell us 10 switches

yesterday. We got 10 of them shits for $350 a piece. I buy a

glock. I got mine in the 45. John been telling me about the

switches and the guns, so I bought all them shits. I spent

like four bands. I said: N-word, let me tell you something

right quick, I ain't squared of shit, boy. That's a sign of

buying what we want; if I don't buy it, somebody else is gonna

be against us." So, in that call, Mr. McCray is essentially

purchasing all of the switches that this particular supplier

has for the primary purpose of arming his gang with those

switches, but also to prevent any rival gangs from having the

switches that could potentially be used against his gang.

So, your Honor, in addition to the drugs and the

violence and the switches, there was also a high degree of

cooperator intimidation that occurred in this case. I'm

referring your Honor to paragraph 34(c) of the PSR, which

talks about a situation where there was group of co-defendants

that were gathered in a room during a pretrial conference, and

at that time, Mr. McCray addressed the entire room and stated,

quote: "If they plan on telling on me, I'm going to take it

to trial and let the whole world know that you're a rat and

telling on me." Mr. McCray then passed a piece of paper

around to the members that were present and gestured toward a

particular individual who was also present so that the group

knew that that particular individual was cooperating with law

1    enforcement.  And then during another hearing, your Honor, Mr.

2    McCray told the co-defendants in his case that, quote:  "Ain't

3    nobody going to talk on me and live to talk about it."

4            So, as your Honor can see, the nature and the

5    circumstances of this offense are extraordinarily serious.  We

6    have an individual who's the leader of a criminal organization

7    that not only is flooding the Charleston area, and

8    particularly the Ten Mile community of North Charleston, with

9    all manners of drugs, including crack cocaine, but we also

10   have a criminal organization that is willing to resort to

11   extreme violence and going as far as committing murders in

12   order to uphold the reputation of the gang, but also protect

13   the gang's turf and protect the gang's inventory.  And when

14   they do this, they then arm their weapons with devices that

15   convert them to fully automatic, which, when multiple rounds

16   are shot simultaneously, it just exponentially increases the

17   risk of an innocent bystander getting struck.  So, it shows a

18   complete disregard for the sanctity of life and anybody else

19   that may be caught up in this nonsense and violence that

20   occurred between Mr. McCray's gang and all the other criminal

21   organizations.

22           As far as deterring criminal conduct, your Honor,

23   unfortunately, Mr. McCray has never been held seriously

24   accountable for any of his criminal acts until now.  And one

25   of the MOs associated with Mr. McCray is, when he is arrested

and charged at the state level, as I mentioned earlier,
witnesses and victims have a tendency of refusing to
cooperate, which serves as a hindrance to holding Mr. McCray
responsible.  Thankfully, in this case, federal law
enforcement was aware of this situation and was prepared to
handle it and prepared to deal with it and move quickly to
prevent that from taking place.  And so, we do think that a
strong federal sentence in this case will serve as a deterrent
to Mr. McCray specifically, but will also serve as a deterrent
to the community at large and send the message that:  Dealing
drugs, and the associated violence that goes with the dealing
drugs, is not going to be tolerated, and anybody that may want
to follow in Mr. McCray's footsteps will also be held
extremely responsible if they engage in similar conduct.

Protecting the public from further crimes of the
defendant, your Honor; your Honor has Mr. McCray's criminal
history, which is rather lengthy.  Mr. McCray has been dealing
drugs and committing acts of violence his entire life.  And,
your Honor, the government's position is that the only thing
that will protect the community from Mr. McCray's future
criminal acts is a lengthy period of incarceration.

Mr. McCray's criminal history is extensive and it
dates back to the 1993, starting when he was 12 years old.
Just some of the highlights, your Honor:  In 1996, Mr. McCray
was convicted of distribution of cocaine.  The next year, in

1997, he was convicted of distributing cocaine near a school.
In 2000, he was convicted of assault and battery of a high and
aggravated nature.  In 2001, he was convicted of shooting
crack in proximity of a school.  In 2002, he was convicted of
filing a false police report; 2023, giving false information,
distribution of cocaine and distribution of cocaine near a
school.  In 2004, he was convicted of assault and battery.  In
2008, he was convicted of possession with intent to distribute
cocaine and distribution of cocaine near a school.  In
addition, your Honor, Mr. McCray was arrested for a murder in
2000.  And Mr. McCray was arrested for several drug and
gun-related offenses in 2017, 2019, 2020 and 2021.  And as I
touched on earlier, a lot of those victims and witnesses would
refuse to cooperate, which would cause issues with the state
prosecution.

Your Honor, if I can distinguish Mr. McCray from the
other members of this criminal organization, our position is
that Mr. McCray is the number-one individual in this criminal
enterprise.  We presented testimony in evidence to your Honor
that Mr. Cox was the number-two individual.  And we believe
that Mr. McCray is above Mr. Cox as far as criminal
culpability goes.  And the main thing that distinguishes Mr.
McCray from Mr. Cox is the level of violence.

As your Honor heard during Mr. Cox's sentencing
hearing, Mr. Cox didn't have the convictions on his record

1   that dealt with violence that Mr. McCray has. Mr. Cox also

2   didn't have the evidence on the record for providing switches

3   to gang members. And Mr. McCray was not the primary source of

4   supply for cocaine, like Mr. Cox was, but Mr. McCray would

5   then take that cocaine and convert it into crack cocaine. And

6   Mr. McCray was the primary source of distribution of crack

7   cocaine in this area. So, we would say, for all those

8   reasons, Mr. McCray is distinguished from Mr. Cox and is above

9   Mr. Cox in the criminal culpability because of the extreme

10  violence that Mr. McCray is associated with.

11          So, in conclusion, your Honor, Mr. McCray is a

12  life-long drug dealer that organized and led a criminal street

13  gang that destroyed a community through narcotics trafficking

14  and acts of gang-related violence. And we firmly believe that

15  there is nothing in the PSR or no evidence that could be

16  presented that would warrant anything less than a guideline

17  sentence in this case. And we would respectfully ask

18  your Honor to sentence Mr. McCray within the guidelines that

19  have been established by the United States Probation Office.

20  Thank you.

21          THE COURT: Okay. Thank you.

22          Yes, sir.

23          MR. GRAMMICCIONI: Thank you, your Honor.

24          With respect to my colleague for the government,

25  about 80 percent of that argument was based on matters that

1    haven't been charged here. I realize what the relevant

2    conduct statute says under the sentencing guidelines and, of

3    course, I recognize, as does my client, Mr. McCray, the

4    criminal history that he's had the unfortunate history of.

5    But at the end of the day, your Honor, I'd just invite the

6    Court back to the counts to which he's pleaded guilty:

7    Conspiracy to distribute narcotics, possession with intent to

8    distribute, possession of a firearm, and a number of unlawful

9    use of a communication facility.

10    Now, Mr. McCray is not running from his acceptance of

11    responsibility, nor his unfortunate history. And I'm going to

12    explain what the PSR, I think, doesn't ring true on behalf of

13    Mr. McCray and his difficult and challenging family

14    circumstances in a moment. But I'd like to point out that it

15    is completely an unfair characterization to try to basically

16    pin 12 murders in the community on Mr. McCray. The one murder

17    that was referenced was dismissed. I mean, it says it right

18    inside the PSR. So, while I appreciate that the Court can

19    give consideration to these things, I would respectfully

20    request that you give limited weight to that. There's a

21    picture that's been painted here, and I'm not sure you can

22    glean what the government wants you to glean, based on what's

23    been agreed upon in the PSR, so I'll go into that a bit.

24    But I want to start off by telling the Court that Mr.

25    McCray is substantially more than the worst thing he has ever

done.  And, admittedly, there's a number of things that he
regrets in his life.  He's more than the person that conspired
to sell narcotics, that committed the 924(c) here.  He is a
44-year-old man who's been happily married for almost a decade
-- or, excuse me, 12 years, a loving father of two, and a
grandfather as well.  And I'll get to the number of family
members that are here supporting him behind me, your Honor, in
the third and fourth row, as indicative of that love and
affection that his family has towards him and vice versa.

Now, the question before the Court is one that I know
the Court's, in every sentencing, thought about:  What is
necessary?  What is necessary to properly punish this man?
That's what 3553 calls for.  I'm not going to sit here and
presume to tell the Court the legal standards on sentencing;
you know them better than anybody in this courtroom, your
Honor.  But I would submit to you that to accomplish the goals
of sentencing under 3553, a minimum -- a mandatory minimum
sentence of 15 years but no more than 20 is sufficient.  It's
not greater than necessary, but it's perfectly sufficient
here.  He's 44-year-old man that, if the Court awarded the
15-year minimum, he'd be released around 59 years old.

Now, I submitted a lengthy sentencing memorandum,
which I know the Court is aware of and has reviewed.  I cited
extensive information about how incarceration doesn't move the
needle, like the government would invite the Court to believe

1  it does. It doesn't. In fact, what it does is for every year

2  in the study that I cited -- for every year of incarceration

3  that a defendant sits in jail, it takes effectively two years

4  off of their life. That's a pretty damning thing for somebody

5  who's 44 years old and expected to get out in his 60s.

6  I also cited to information that the United States

7  Sentencing Commission even has recognized for the last 10

8  years, which is that people who are older tend not to

9  recidivate. And, look, again, I'm not running from the

10  criminal history that Mr. McCray has -- and I'll get to that

11  in a moment -- but it's an important fact here. With age

12  comes wisdom. This is a serious offense, which Mr. McCray has

13  recognized, that he's pleaded guilty for and accepted

14  responsibility. He wants to try to return -- become a

15  productive member of society and return to being a role, an

16  active and proactive present person in his family's life.

17  As demonstrated in the PSR, I'd ask the Court to take

18  a look at his family and personal characteristics. He's

19  grappled with financial and familial instabilities since his

20  juvenile years. After dropping out of school at 14, he sadly

21  fell into a life of narcotics, which is not a song that I know

22  this Court hasn't heard before, particularly in the

23  African-American communities, where there is less opportunity

24  to financially be able to support your family. I will also

25  note that these crimes were committed right around the time

that the pandemic struck this area and, of course, the entire
United States, and financial instability was made even worse
for somebody like Mr. McCray. And he wants to support his
family. Again, that's not a justification for committing a
crime, but it's something that I think the Court should
recognize. He fell into this life of narcotics and abuse as a
young child and, unfortunately, he fell into that cycle of
narcotics abuse by daily using Percocet and cannabis. But
these struggles notwithstanding, he continued to prioritize
his family life. And as an adult, he launched his own lawn
care business to support his family. He has been described by
his family, who knows him best, as an easygoing person with a
big heart.

I'm going to go through some of the 3553(a) factors
that I would respectfully disagree with my government
counterpart's conclusions on, in support of the sentence that
I think is sufficient but not greater than necessary, and
that's a minimum of 15 but no more than 20 years in prison for
Mr. McCray. Mr. McCray's nephew, in a letter that I submitted
as part of our sentencing cases, described Mr. McCray's life
as one marked by financial hardship and the looming threat of
homelessness. He had a hard life, but still worked really
hard to be a good father, husband, and to remain employed. As
I mentioned, the world changed in 2020. And a lot of his
criminal conduct that was committed in the charged offenses

1    here -- again, it's not an excuse for it, but it's something

2    that I think is mitigating.  He needed to be able to support

3    his family.  And while nobody should think of a life of

4    illegal activity in doing so, at the end of the day, he needed

5    to put food on the table for his loved ones.  He had no

6    meaningful choice but to engage in this to make ends meet.

7         On page six of my sentencing memo, I referenced that

8    lengthy jail sentences don't work as it is.  Again, that's not

9    to say that a jail sentence is appropriate.  But I think the

10   one that we're recommending is sufficient but not greater than

11   necessary to accomplish the sentencing goals.

12        I also would like to note Mr. McCray has been in jail

13   for nearly two years already.  So, the minimum requested

14   sentence would be an additional 13 that he would be away from

15   his family.  He would carry the stigma of a federal felony

16   conviction.  His employment prospects, just based on his age

17   by the time he's released, are already curtailed.  So, I would

18   submit that the Court don't make it anymore difficult for him

19   to return and become a productive member of society.  The

20   older he is when he's released, the harder it will be for him

21   to be able to gain employment to support his family and

22   himself.  In terms of rehabilitative capabilities, Mr. McCray

23   has indicated, as set forth in the PSR, that he wants to

24   return for the love of his family and to begin working in the

25   lawn care business again.

1          And, your Honor, you've probably heard this before

2     from defense attorneys:  The concept of mercy.  The concept of

3     mercy has been around since the Roman era times.  In fact,

4     people used to carry around coins that could be presented when

5     mercy was necessitated by a magistrate or somebody in a

6     position of determining someone's guilt or innocence and

7     punishment.  We don't have a coin to give you, your Honor, but

8     we have my argument, we have Mr. McCray's loving and

9     supportive family, some of which, if the Court's willing,

10    would like to address the Court.  And then, of course, you'll

11    hear from Mr. McCray himself.

12         I mentioned in the beginning of the proceeding that

13    the career offender under the guidelines appears to be

14    applicable.  But I would ask the Court to disregard this

15    designation, as a majority of judges across the country have,

16    for years, recognized and appreciated what the commission

17    itself concluded as far back as 2004, that sentences dictated

18    by career offender guidelines are the most severe and least

19    likely to promote sentencing purposes.  In fact, since *Booker*,

20    career offender guideline sentences have decreased from

21    44 percent in 2005, to 27 percent in 2014.  And by the time

22    2021 rolled around, according to the commission's own

23    statistics, not even 20 percent of judges were imposing

24    career-offender sentences.  And unfortunately, the disparity

25    is even worse for African-American male defendants.  Of the

1   1,216 career offender guideline cases in 2020, 97 percent were

2   men and 61 percent were African American.  That same Quick

3   Facts 2020 study from the commission noted that 53 percent of

4   individuals exposed to career offender guidelines received a

5   *Booker* variance below that guideline range.

6          Your Honor, again, Mr. McCray is looking forward to

7   the opportunity to explain to you why he will become a

8   productive member of society, why mercy is appropriate here.

9   But before getting to that, if the Court's willing to allow

10  it, a few members of his family would like to briefly address

11  the Court.  I'd like to recognize the following who are here

12  to support.  His mother, Debra Shuler; his brother, Laron

13  McCray; his sister, Dayomia McCray; his sister-in-law, Katrina

14  Ravenel; his -- what's been characterized as his second mom,

15  because he's so close with this lady:  Alethia Robinson; and

16  cousin, Lavell Harris; as well Khalil Gore, his nephew.

17         And, your Honor, if Ms. Shuler could speak on her

18  son's behalf, I'd appreciate the opportunity.

19         THE COURT:  Sure.  It's probably better to come up to

20  the podium.

21         MS. SHULER:  How you doing, your Honor?

22         THE COURT:  Good.  Thank you.

23         THE WITNESS:  My name is Debra Shuler, and I'm Fred

24  McCray's mother.  And I'm just here on his behalf.  I don't

25  condone nothing that happened.  I'm here on his behalf because

1   he did have a very hard life.  I got married at 17 years old,

2   and my husband left within, like, four years.  And I was left

3   to raise my four little kids.  And I did -- I feel like I did

4   a very good job.  I worked hard to do two jobs.  And my kids

5   remembering -- I guess Fred's remembering when we were hungry,

6   homeless, a lot of times -- I'm so sorry.  A lot of times we

7   didn't have no place to sleep.  We had strangers that -- and

8   he always looked me in the eye, a four-year-old kid,

9   five-year-old kid, saying:  Mom, you're going to be okay.

10  It's going to be okay.

11          But, I mean, I don't condone nothing that's, you

12  know, out in the street to hurt anyone, but I know my child is

13  a very good child.  He's a good child at heart.  I know that

14  he cares about people.  And I prayed a lot and I talked to him

15  a lot.  And, you know, I let him know that wasn't the way to

16  go, because I worked two and three jobs just to -- my kids

17  never lacked for nothing.  After my husband left and I had to

18  take care of them, they never lacked, because I worked two and

19  three jobs.  But my son felt like:  Mom, I love you.  He never

20  -- and he can ask you.  I never take a dime from him, because,

21  you know, I don't condone things wrong out in the street.

22          But I just want y'all to know he's a very good

23  person.  And I know the law is the law and he shouldn't have

24  done -- but I've spoke to him.  And he has four kids now.  And

25  he has a two-year-old that he's never seen, because he was

incarcerated, and he has a 16-year-old that's in high school
that loves him very much.  I think he might have spent like
three or four years with him.  And he also has one in college,
and then also an older son.  And a lot of the things that I
hear them say, I know my child never murdered anybody or
anything.  Never.  And he's never been convicted of a murder.
So, I mean, I hear things but I know that that's not true.
He's never been convicted for murder.

But I'm just wanting your Honor to please give mercy
on him today and try to give him the lightest possible
sentence that you could, because I know that he's a good
person.  I know that he'll come out here and be good in
society and will help.  I own a T-shirt business.  I'm 64
years old.  So, I'm looking to leave that business for him so
he can have something to do with his time and also keep that
business going.  And so, I'm asking, your Honor, please give
some mercy on him, because he's a very good person.  He will
give you the shirt off his back.  And I guess greed got a part
of what was going on.  And it's not right, but greed got a
part; looking at the money, like:  I'll be able to help my
family, my children and my wife and everybody.

But I'm asking you, please, your Honor, please,
because he did grow up with a bad life, without a father.  And
it was hard.  I tried my best to raise him, but it was very
hard.  So, I'm asking y'all to please give some mercy -- the

1     Court to please give some mercy.  And I thank y'all so very

2     much for listening to me.

3          THE COURT:  Thank you.

4          THE WITNESS:  Okay.

5          MR. GRAMMICCIONI:  Your Honor, with the Court's

6     permission, we would now call up Laron McCray and Dayomia

7     McCray, Mr. McCray's brother and sister, who will stand at the

8     podium together but will address the Court separately,

9     briefly.

10         THE COURT:  Thank you.

11         MR. GRAMMICCIONI:  Thank you.

12         DAYOMIA MCCRAY:  Hello.  I'm Dayomia McCray.  I'm the

13    youngest sibling of four.  Frederick is like my father, my

14    best friend.  Excuse me.  He's a loving father of four, which

15    he has a one-year-old daughter that he has not seen in life.

16    I ask that you be very lenient on him.  He is a guy with a big

17    heart who got caught up in a fast world.  And I do apologize

18    on his behalf.  And I just ask that you please have mercy on

19    him as much as possible.  Thank you.

20         LARON MCCRAY:  How you doing?  My name, Laron McCray.

21         Good afternoon to the Court.

22         And with all due respect, Judge, Government, the

23    lawyers, I just want to say:  I know everybody have a job and

24    I know what the law is.  But what makes me angry sitting here

25    in this court today is when I know what I'm hearing is a lot

of falsified things going on.  That's my brother right there.
I know him.  When they mentioned that he's a leader of a gang,
when we was growing up -- and now -- we look at gangs as being
a joke.  So, it's impossible for him to be a leader of a gang.
That's impossible.  But I know as the government, prosecutors,
it's their picture -- it's the duty to paint the most ugliest
picture to the Court, to get a conviction.  Not to undermine
or degrade their job or their investigation, but a lot of
things I'm hearing, I know it's falsified.  And you highlight
the things that's on the wiretaps or whatever, but I know for
a fact, Judge, a lot of this stuff is being falsified for a
fact.

That's my brother's life.  I put my life on the line
for him.  And I'm not going to stand -- I've never done this
before in my life.  I'm a very shy person.  But that's his
life we're talking about.  That's his life.  Anybody that know
me in the courtroom, know I'm a quiet person, very quiet, not
outspoken at all.  But I'll change anything for him.  That's a
great guy there.  Yeah, we had a hard life.  Yeah, we did a
lot of things growing up in the projects and doing this and
doing that without a father.  That's hard.  And it's hard for
some people to even perceive that life, to even interpret it
the correct way, because it's hard to fathom if you never came
from that environment.  But we did that.  And we achieved more
in our life and family, coming from nothing.  Like my mother

said, we was homeless a lot of times, with no family. So, I know a lot of y'all are very smart people. You know what that can do to your mental as a young child. It can screw you up.

That's all I wanted to say. Just have mercy on my brother's life, because I want to see him again. And I know he's a great guy. I talk to him almost every day. And I hear change in his voice. I can hear it, you know. But y'all have a job to do. Y'all have a lot to uphold. And I respect it. But I also ask you to treat him like a human, not to just end his life right then, because, he never knows when he'll see his mother again, or see his child that he never saw before. We all know a lot of things happen back in there. A lot of people don't make it out.

I ask you, Judge, and the Court, just for leniency. And I thank you.

DAYOMIA MCCRAY: Thank you.

MR. GRAMMICCIONI: Thank you, your Honor.

Before I conclude, if the Court would hear from Mr. McCray, he'd like to make a statement to your Honor.

THE COURT: Sure, uh-huh.

THE DEFENDANT: Your Honor, I take full responsibility for all the charges that I pled guilty for, but I don't take full responsibility for the picture that they're painting against me. The picture they're painting against me, my life ain't nothing like that. But I do take full

responsibility for all the charges that I pled guilty to.

THE COURT:  Okay.

MR. GRAMMICCIONI:  Your Honor, I'll just briefly conclude.  Thank you for that opportunity.

I was listening to the government's argument, and it sounded like they were painting this picture of this gang and narcotics conspiracy that sounded like something as sophisticated as La Cosa Nostra, which I know a little bit about when I was a prosecutor in New Jersey.  And, your Honor, I know the Court knows that, in many cases, especially in urban areas, it's the furthest from here, right?  That's not to say that there is any excuse for affiliating with other people that are involved in narcotics activity people, but there is something to be said for the necessity for protection.  That is something that I would ask the Court to consider.  There's certainly no justification or excuse in the use of a firearm in facilitating a narcotics conspiracy, but it's an unfortunate reality these days on the streets.

I also -- when the government asked for a guideline sentence, just let it sink in for a minute, that if he's 44 years now, he'll be getting released at 74 years old.  I think that's the furthest thing from the definition of fair, and I'd respectfully submit the sentence that we recommend is more appropriate and is sufficient but not greater than necessary to sentence Mr. McCray.

1       And I'll close with:  Even President Lincoln aptly

2   recognized that "mercy bears richer fruits than strict

3   justice."  So, I'd just ask the Court, considering Mr.

4   McCray's age, his personal circumstances, his challenging

5   life, his ability to work when he is ultimately released from

6   prison to support his family -- we'd ask that the Court issue

7   the sentence that we've asked for.  And I'll answer any

8   questions that the Court may have, but, otherwise, that

9   completes our argument.

10      THE COURT:  Okay.  I appreciate your thorough

11  presentation and your memorandum.  Very well done.  Read

12  everything, heard from his family.  And that's almost the

13  hardest part of the Court's job in every case.  When you

14  sentence a defendant, as his brother said, you sentence a

15  human being, and not only that, you sentence his family.  So,

16  it's a heavy responsibility and one that gives the Court great

17  pause every time -- every single time.

18      The Court's going to take a five-minute recess and

19  head back to the jury room for just a minute; okay?

20      MR. GRAMMICCIONI:  Your Honor?

21      THE COURT:  Uh-huh.

22      MR. GRAMMICCIONI:  This was through my own

23  inadvertent error.  I gave a copy to the government.  There's

24  one additional letter that I neglected to file.  It was kind

25  of late breaking because of my mistake.  So, I apologize to

1    the parties.

2              THE COURT:  All right.  You can hand that up.

3              MR. GRAMMICCIONI:  Thank you, your Honor.

4              THE COURT:  Uh-huh.  Thanks.

5              *(Recess.)*

6              THE COURT:  Thank you.  Take your seats, please.

7              Okay.  I've read the submitted-by-hand character

8    letter from Mr. McCray and I have read the sentencing

9    memorandum, filed by his lawyer.  I've considered that.  I've

10   considered everything he has written in that written

11   memorandum.  And I have considered all the points that he has

12   raised at the sentencing.  I've considered the remarks of all

13   his family members, which, as I mentioned, is -- in a

14   sentencing, the hardest part is the family, because they're a

15   solid family.  They had courage to come in here and continue

16   to express their love and support for their brother.  And I

17   appreciate everything they said.  I appreciate that they said

18   that -- and I sympathize and have compassion for the fact that

19   he had a really tough upbringing, and his poor mom had to hold

20   down three jobs to take care of them, and that he tried to

21   reassure his mother every step of the way.

22              I appreciate the science that defense counsel placed

23   in the sentencing memorandum in regards to age and aging out

24   of criminal thinking, et cetera.  I am going to disregard part

25   of the government's 3553(a) and general arguments in regards

1    to the murders that they believe that Mr. McCray was

2    responsible for in one way or another.  He was not -- as he

3    has said, he has not been convicted of a murder.  And so, the

4    Court's not going to consider that.  They were zealous in

5    their advocacy, and the Court respects that, but it's not

6    going to consider that specifically.

7         I am going to consider the information that they got

8    directly off of the Title III wiretap, in which Mr. McCray is

9    heard talking several times in various wire calls -- I've got

10   them written down:  9914, 2574, 5574 and 5713 -- about the

11   handling, sharing, selling, whatever form they used to

12   distribute amongst each other and Mr. McCray directly,

13   involved in these things called switches, which make guns more

14   dangerous and more lethal.  I mean, it's on the wire, it's on

15   the wire; he's talking about it.  And apparently that was

16   talked about and corroborated.  So, I am going to consider

17   that.

18        His criminal history is lengthy.  It is troubling.

19   And he is the author of his own history.  There's nothing

20   anybody can do about that, but it is a serious criminal

21   history.  And I believe, based on my experience with this

22   case, and having heard testimony, and being very familiar with

23   all of it, that Mr. McCray was the number-one actor in the

24   organization in terms of everything, in terms of the drugs,

25   and in terms of the level of involvement with the switches and

1    the crack cocaine.

2          And I hear what defense counsel has asked for in

3    terms of mercy, and so I am going to give them a little mercy,

4    in that I am going to grant the motion for a variance, based

5    primarily on Mr. McCray's troubling and troubled upbringing

6    and the poor circumstances and dire circumstances that he grew

7    up in.  I understand he had a lawn care business that he wants

8    to get back to.  Mr. Grammiccioni said that the pandemic had a

9    lot to do with Mr. McCray's involvement in this drug

10   distribution network to make money because of the pandemic.

11   But the Court doesn't really buy that.  I think Mr. McCray is

12   an able-bodied man.  And this able-bodied man had a business,

13   and he should have just worked harder at a lawful business.

14   And I don't think he should necessarily blame that on the

15   pandemic.

16          So, having calculated and considered the advisory

17   sentencing guidelines -- I'm not going to sentence him based

18   on the Armed Career Criminal Act.  That was also something

19   else that I wanted to put on the record.

20          And so, having done that, having calculated and

21   considered the advisory sentencing guidelines, and having also

22   considered the relevant statutory sentencing factors contained

23   in 18 U.S.C., Section 3553(a), it's the judgment of the Court

24   that the defendant, Frederick Wendell McCray, is hereby

25   committed to the custody of the Bureau of Prisons, to be

imprisoned for a term of 360 months. Said term consists of 300 months as to Counts 1 and 2; 120 months as to Count 4; and 48 months as to Counts 16 through 18, 20 through 24 and 26, to run concurrently; and 60 months as to Count 3, to run consecutively to all other counts. It appears he doesn't have the ability to pay a fine, so the fine is waived. But he shall pay the mandatory $1,300 special assessment fee.

Upon release, he shall be placed on supervised release for a term of five years. Said term consists of five years as to each count, 1, 2 and 3; three years as to Count 4; and one year as to Counts 16 through 18, 20 through 24 and 26, to run concurrently. While on supervised release, he shall comply with the mandatory conditions outlined in 3583(d) and Section 5D1.3(a), and the standard discretionary conditions in 5D1.3, as noted in paragraphs 143 and 145 of the presentence report, which I have adopted in full into the record.

Standard conditions one through nine and 13 serve the purpose of public protection and rehabilitation, pursuant to 3553(a)(2)(C) and (D).

Conditions 10 and 12 serve the statutory purpose of public protection, pursuant to 3553(a)(2)(C).

Condition 11 ensures he doesn't engage in activities that may potentially conflict with the other conditions of supervision that may pose risk to his probation officer. And he shall also comply with the following conditions, for the

1    reasons set forth in the presentence report.  And that is, he

2    must submit to substance abuse testing to determine if he's

3    used a prohibitive substance and contribute to the cost of

4    that, not to exceed an amount determined reasonable by the

5    Court's Sliding Scale for Services, and he will cooperate in

6    securing any applicable third-party payment, such as insurance

7    or medicaid.  And this is recommended based on his conduct

8    involving controlled substances and his admitted substance

9    abuse history.

10    Any objection to the form?

11    MR. LIETZOW:  None from the government, your Honor.

12    At the appropriate time, though, I -- I did neglect to ask you

13    to incorporate the preliminary order of forfeiture.  So, just

14    for the purposes of the record, I would ask your Honor to do

15    that.

16    THE COURT:  Granted.

17    MR. GRAMMICCIONI:  No objections.

18    THE COURT:  Okay.  Probation, any objection to the

19    form?

20    PROBATION OFFICER:  No, your Honor.

21    THE COURT:  All right.  You have 14 days from the

22    entry of judgment to file a notice of appeal.  If you want to

23    appeal and you can't afford a lawyer, the Court will appoint

24    one for you.  Thank you.

25    THE DEFENDANT:  I understand.  So, how much time I

1  get?

2           MR. GRAMMICCIONI:  Thirty years.

3           THE DEFENDANT:  360 months?

4           THE COURT:  What did he say?  I couldn't understand

5  him.

6           MR. GRAMMICCIONI:  Your Honor, Mr. McCray was asking

7  what his sentence was.  And I was explaining to him that the

8  Court ordered a 360-month sentence, among other conditions.

9           THE COURT:  Correct.  Thank you.

10          MR. GRAMMICCIONI:  Your Honor, before we conclude, is

11  it possible that the Court would entertain a recommendation to

12  the Bureau of Prisons to have Mr. McCray serve his

13  incarceration at a facility within South Carolina?

14          THE COURT:  I'll order BOP to have him serve his

15  sentence within South Carolina.  I hope BOP will listen.

16          MR. GRAMMICCIONI:  Thank you, your Honor.

17          THE COURT:  Thank you.

18                      *  *  *  *  *  *

19

20      I certify that the foregoing is a correct transcript from

21  the record of proceedings in the above-entitled matter.

22      s/Lisa D. Smith,                    4/4/2024

23      _____      _____
        Lisa D. Smith, RPR, CRR              Date

24

25